IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| CATHERINE SLACK, <br><br> *Plaintiff*, <br><br> v. <br><br> CHRISTOPHER TUCKER, KENNETH CINERESKI, and MICHAEL WILLIAMS, <br><br> *Defendants*. | CIVIL ACTION NO. <br> **3:24-cv-00127-TES** |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Two friends, who hadn't seen each other since returning home from studying

abroad, decided that an impromptu night out in Downtown Athens would be a great

way to catch up. Truth be told, their night went swimmingly. That was, however, until

the friends happened upon what is a very common occurrence on a weekend night in a

college town: police officers talking to a college-aged kid about suspected underage

drinking. Rather than just let the cops do their job, one of the friends decided to offer

the young man some unsolicited advice. Her attempt at being a Good Samaritan didn't

pan out as planned. The officers arrested *her* for allegedly being drunk in public, and

she spent the rest of her night in jail. The young man? Well, the officers helped him call

an Uber and sent him home.

"The freedom of individuals verbally to oppose or challenge police action

without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Hou., Tex. v. Hill*, 482 U.S. 451, 462–63 (1987). So, of course, the Constitution allows us to exercise our right to free speech, but it never requires us to do so. Sometimes, it's best to just mind your own business. Then again, once you know the detailed facts of this case, it's certainly possible that the officers might've overreacted in making their arrest so quickly. Claiming that the arrest violated the Constitution and Georgia law, the friend who spent the night in jail has sued three Athens-Clarke County police officers, and they have jointly moved for summary judgment on each claim asserted against them.

## **FACTUAL BACKGROUND**

Sanjana Ayyappan first met Plaintiff Catherine Slack[1] on their summer study-abroad trip to Cortona, Italy, in 2023 through the University of Georgia.[2] Sanjana had just finished her sophomore year, and although Catherine had just walked at graduation, it wasn't until August 2023—after completion of the study-abroad program—that she officially earned her degree.[3] Together for two months, for a

---

[1] Throughout this decision, the Court refers to Ms. Slack by her first name, Catherine. It does not do so to try and be overly familiar. Nor does it do so out of a lack of respect. Its choice to exclusively refer to her by her first name is purely stylistic for story-telling purposes.

[2] [Doc. 25-3, Ayyappan Depo., p. 14:3–9]; [Doc. 25-4, Slack Depo., p. 46:1–2]; [Doc. 26-1, ¶ 1].

[3] [Doc. 25-3, Ayyappan Depo., p. 14:12–16]; [Doc. 25-4, Slack Depo., p. 9:2–9].

summer in Italy, Sanjana and Catherine started as roommates but became fast friends.[4]

Cut to Friday, March 15, 2024—St. Patrick's Day weekend, and Sanjana, who was still enrolled at UGA and living in Athens, asked Catherine if she wanted to come have a girls' night.[5] They hadn't seen each other since Italy, so Catherine decided to make the trek to Athens from Atlanta via her parents' house in Buford, Georgia.[6]

After Catherine arrived, she and Sanjana chatted in Sanjana's dorm for about 45 minutes, and then they walked downtown to dinner.[7] On the way, they made a quick stop by the main library so Catherine could visit one of her old friends who worked at the security desk.[8] From there, they went to dinner at a sports bar called Dooley's.[9] They both had water with dinner, and Catherine "sipped on" (but finished) an alcoholic, orange juice-based drink called an "Obomb."[10] After spending around an hour at dinner, Catherine and Sanjana made their way to a bar, but when it comes to *where* they went after Dooley's, their testimony is a wee bit scattered.

---

[4] [Doc. 25-3, Ayyappan Depo., pp. 14:6—16:5].

[5] [*Id.* at pp. 17:1–9; 18:3–5]; [Doc. 25-10, Williams Depo., p. 19:7–9].

[6] [Doc. 25-3, Ayyappan Depo., p. 17:5–24]; [Doc. 25-4, Slack Depo., pp. 25:10—26:4; 28:12–17; 31:11–14]; [Doc. 26-1, ¶ 2].

[7] [Doc. 25-3, Ayyappan Depo., pp. 17:10—18:8; 18:14]; [Doc. 25-4, Slack Depo., p. 31:11–25].

[8] [Doc. 25-3, Ayyappan Depo., p. 18:14–15]; [Doc. 25-4, Slack Depo., p. 31:23–25].

[9] [Doc. 25-4, Slack Depo., pp. 32:1–7; 38:11–16].

[10] [*Id.* at pp. 32:1—33:15; 42:4–5]; [Doc. 26-1, ¶ 7].

After Dooley's, Catherine testified in her deposition that they went to a bar called Up Dawg and stayed there for about 20 minutes.[11] While at Up Dawg, Catherine admits that she "ordered a beer and . . . sipped on it."[12] "[Catherine] can't remember if [she] finished the beer."[13] From Up Dawg, she testifies that they went to a bar called Bad Moon for about 30 minutes before bar hopping—she thinks either to City Bar or Silver Dollar—and eventually landing at a place called Sandbar.[14] Until they got to Sandbar, Catherine testified that she and Sanjana hadn't had anything to drink besides water but that Sanjana ordered a margarita at Sandbar and "offered [her] a sip of it."[15]

Sanjana, on the other hand, testified in her deposition that once they left Dooley's, they went to a bar called 1785 where she believes Catherine "consumed a Twisted Tea."[16] From 1785, Sanjana says they went to a place called Bar South, and like Catherine, she testified that their last stop was Sandbar.[17] Although Catherine and Sanjana have different accounts of where they bar hopped, at least their testimony

---

[11] [Doc. 25-4, Slack Depo., pp. 34:15—35:1].

[12] [*Id.* at p. 35:7–10].

[13] [*Id.* at p. 42:5].

[14] [*Id.* at pp. 36:2–7; 37:14–17; 37:23—38:5; 38:22—40:17]; [Doc. 26-1, ¶¶ 11–12].

[15] [Doc. 25-4, Slack Depo., pp. 36:19–25; 39:17–25; 40:9–11; 40:24—41:3].

[16] [Doc. 25-3, Ayyappan Depo., p. 19:7–21].

[17] [*Id.* at pp. 19:22–25; 20:10–12].

about where they started and ended is the same.[18] So, when it comes to alcoholic drinks, Catherine and Sanjana's deposition testimonies show that Catherine, in about a four-hour timespan, drank the Obomb at Dooley's, either sipped on a beer at Up Dawg or consumed a Twisted Tea at 1785, and was offered a sip of Sanjana's margarita at Sandbar.[19]

After Sandbar, Catherine remembers that she "wasn't feeling too well just from being on [her] feet" and that she wanted to "get home, lay down, drink some water," and spend time with Sanjana at the dorm.[20] However, as they started to walk back to Sanjana's dorm from Sandbar, Catherine noticed police officers with their bicycles huddled around a young man who had apparently "almost got smoked by [a] car."[21] Catherine, who was then "planning to enlist in the National Guard" and eventually go to law school, testified that she wanted to make sure the young man "kn[ew] his rights."[22] In her words, because "justice is an order," she "wanted to stand up for . . .

---

[18] In opposing summary judgment, Catherine contends that, "[a]t no point in her testimony did [she] mention going to a bar called 1785 . . . ." [Doc. 26-1, ¶ 9]. That's incorrect. Catherine clearly testified that she and Sanjana "might've stepped into [1785] . . . and maybe Bar South" to "check the scene out." [Doc. 25-4, Slack Depo., p. 45:8–15].

[19] [Doc. 25-3, Ayyappan Depo., p. 22:18–20]; [Doc. 25-4, Slack Depo., p. 44:24–25].

[20] [Doc. 25-4, Slack Depo., p. 42:9–23].

[21] [*Id.* at pp. 48:19—49:2; 50:11–12]; [Doc. 25-6, Tucker Depo., p. 18:21–22].

[22] [Doc. 25-4, Slack Depo., p. 49:4–10].

someone."[23] Sanjana, too, testified that she thinks Catherine saw the officers questioning the young man and just "wanted to intervene."[24]

As best the Court can tell, Catherine and Sanjana had already passed the officers and the young man, and contrary to Sanjana's plea, Catherine just couldn't "let this one go."[25] So, Catherine made the premeditated decision to turn around and walk towards the officers and the young man rather than continue on their walk back to Sanjana's dorm.[26] From here, the bodycam placed onto the record best depicts the truth of what happened next. After all, "Video don't lie." *Whitworth v. Chambers*, No. 3:25-cv-00138-TES, 2026 WL 926607, at *1 (M.D. Ga. Apr. 6, 2026). In detailing the bodycam footage, you'll notice that the Court pinpoints the exact centisecond of when things occurred. Why? Because the most important—and *relevant*—window of facts that Catherine uses to support her claims takes place in about a two-minute timeframe.

At 1:01:21 A.M., on what was now Saturday, March 16, 2024, Defendant Christopher Tucker (hereinafter "Officer Tucker") can be seen cycling just ahead of

---

[23] [*Id.*].

[24] [Doc. 25-3, Ayyappan Depo., p. 23:8–11].

[25] [*Id.* at p. 27:5–10].

[26] [Doc. 25-4, Slack Depo., p. 52:9–15]; [Doc. 26-1, ¶ 26].

Defendant Kenneth Cinereski (hereinafter "Officer Cinereski").[27] Officer Cinereski's

bodycam[28] shows Officer Tucker placing himself and his bicycle between the street and

the young man at a street corner while Officer Cinereski slowly maneuvers his bicycle

on the sidewalk through a sparse crowd of pedestrians eventually placing himself

behind the young man within 15 seconds at 1:01:36. Essentially, the young man is

sandwiched between Officer Tucker and Officer Cinereski. From 1:01:37 to 1:01:50, the

officers can be seen questioning the young man, and Officer Cinereski, now to the

young man's left, sort of boxes him in by using the front wheel of his bicycle to form a

right angle with the front wheel of Officer Tucker's bicycle. At 1:01:51, the bodycam

audio turns on, and at 1:01:59, Officer Tucker can be heard asking the young man if he

has a way to get home. At 1:02:13, Officer Tucker asks the young man, "Where did your

friend go? He needs to get you home."[29] Officer Cinereski, at 1:02:15, points across the

---

[27] *Compare* [Doc. 25-5, Cinereski Depo., pp. 22:17—23:11; 24:10–12 (Officer Cinereski testifying that he "was on the backside" and "was riding up behind" Officer Tucker and that Officer Tucker "was the one who [was] actually . . . talking to" the young man)], *with* [Doc. 25-6, Tucker Depo., pp. 18:11—19:13; 25:14–16 (Officer Tucker testifying that Officer Cinereski "made contact with the young man" and that Officer Tucker "was set back just a bit" and "was there for [Officer Cinereski's] safety to make sure he didn't get hurt by the [young man] he was trying to stop")]. In a nutshell, what we have here is either an officer swap, or one officer who can't remember who did what that night, or a mislabeling of bodycam footage, or one officer who can't accurately identify himself on said footage. [Doc. 25-6, Tucker Depo., pp. 18:19–20 ("So that is not actually what happened. Maybe you got me and [Officer Cinereski] crossed up."); 30:15–16 (Officer Tucker testifying, "So when Catherine . . . puts herself into [Officer *Cinereski*'s] stop [of the young man]")]. To clarify what's going on and to clear up any confusion, Officer Tucker is wrong, and he's mixing stuff up.

[28] [Doc. 25-7].

[29] *See also* [Doc. 25-5, Cinereski Depo., p. 27:20–23 (Officer Cinereski affirming in his deposition, "In [his] review of the video, [he] also heard [Officer] Tucker say, 'Where did your friend go? He needs to get you home.'")].

street and says, "He just walked off that way." From 1:02:18 to 1:02:22, Officer Tucker

asks the young man, "Do you have a phone? You need to get your friend to call an

Uber."

At 1:02:17, Catherine, having just passed the officers and the young man with

Sanjana beside her, pauses in the crosswalk, turns to look at them, and at 1:02:21 walks

back across the crosswalk. From 1:02:22 to 1:02:23, from what would be the opposite, or

"open,"[30] side of the "box" formed by the officers' two bicycles, Catherine can be heard

asking the young man, "Did you call your lawyer?" Then, at 1:02:26, Officer Cinereski

says to Catherine, "Hey, ma'am? Can you just go ahead and walk away right now?" At

1:02:28, it appears from the video that Catherine is telling the officers that they do not

have a "legal right" to be questioning the young man, and to that, Officer Cinereski

engages the kickstand on his bicycle and replies, "Yes, we do. You have no idea what

was going on at that point in time." At 1:02:34 to 1:02:35, Catherine can be seen walking

"into" that "open" side of the "box" formed by the officers' bicycles putting her right

behind Officer Tucker.[31] She has her left forearm across her body, resting it on her waist

---

[30] *See also* [Doc. 25-5, Cinereski Depo., p. 25:17–21 (Officer Cinereski's testimony, "I mean, there's only two of us. There's still two other ways he could run at that point in time.")].

[31] With respect to how Officer Tucker personally recounts this moment, he testified, "This is kind of a -- I'm not trying to be rude here, boss, but that's a little bit preposterous. I mean, she was walking towards [Officer Cinereski]. . . . We're both grown men, we know what it looks like when people perambulate. She was looking at him, shouting at him, and walking towards him." [Doc. 25-6, Tucker Depo., p. 38:3–24].

bag, and she has her right elbow barely touching her left hand.[32] With her driver's license clutched in her right hand and her right hand no higher than her shoulders, she tells the young man, "Don't answer any questions. Call your dad." At 1:02:35, another officer—presumably Defendant Michael Williams (hereinafter "Officer Williams")—about 10 to 15 feet away with his bicycle, has made his way to the scene, but he only assisted Officer Tucker and Officer Cinereski in writing Catherine's citation and waiting for [her] transport" to the jail.[33]

From 1:02:34 to 1:02:36, Officer Cinereski walks past his parked bicycle towards Catherine and tells her, "If you don't want to go to jail for obstruction, I suggest you . . . ." But, *before* Officer Cinereski can even finish his sentence, Officer Tucker, at 1:02:36 to 1:02:37, grabs Catherine by her right arm and says, "Nope, we're done."[34] For the next nine seconds, Officer Cinereski can be seen grabbing Catherine's left arm, helping Officer Tucker place her in handcuffs. As the two officers secure the handcuffs around

---

[32] *See, e.g.*, [Doc. 26, p. 10].

[33] [Doc. 25-10, Williams Depo., pp. 11:15–16; 11:25—12:1; 13:6—14:24].

[34] Officer Tucker testified that he "did a double arm scoop, where you pull a person's arms together behind their back" and that Officer Cinereski "helped [him] out and applied the handcuffs because this is a two-person arrest tactic generally." [Doc. 25-6, Tucker Depo., p. 37:17–21]. So, when looking at the bodycam footage and in matching the officers' actions with this specific portion of Officer Tucker's deposition testimony, it seems that *Officer Tucker* not Officer Cinereski was the one who "made contact with the young man." *Contra* [*id.* at p. 18:11–22]; *see also* n.27, *supra.* Further, Officer Tucker testified that he believes Officer Cinereski "gave [Catherine] several clear commands to move away." [Doc. 25-6, Tucker Depo., pp. 44:25—45:3]. This, again, when looking at the bodycam footage and in matching the officers' actions with this specific portion of Officer Tucker's deposition testimony further demonstrates that *Officer Tucker* not Officer Cinereski was the one who "made contact with the young man." *Contra* [*id.* at p. 18:11–22]; *see also* n.27, *supra.*

Catherine's wrists, Officer Tucker, at 1:02:47, tells her, "You're goin' for public intox."

"I'm not intoxicated," Catherine firmly, but respectfully, responds.

All of 14 seconds passed from the first time Catherine's voice can be heard asking the young man whether he called his lawyer to when she was arrested, and all but 10 seconds passed from the time Officer Cinereski first start talking to Catherine until Officer Tucker began putting her into handcuffs. Admittedly, "talking to Catherine" is somewhat of an odd phrasing, but that's because the parties heavily dispute whether Officer Cinereski gave Catherine a lawful command or merely a request when he said, "Hey, ma'am? Can you just go ahead and walk away right now?"[35] More on that later, though, as resolution of that dispute makes or breaks Catherine's claims.

With Catherine cuffed, Officer Cinereski takes her driver's license from her hand and says, "Give me your I.D." Catherine tells Officer Cinereski, "I'm a UGA graduate," and he says, "We told you to walk away because you have no idea of what's going on over there, and you continued to interject yourself." "[T]old?" Maybe. Just before walking Catherine to a nearby bench, Officer Cinereski informs her that she's going to jail for public intoxication "instead of . . . going for obstruction." While walking to the bench, Catherine says, "I need to give my dad a call," to which Officer Cinereski simply said, "Okay, you can do that at the jail." From here, Catherine begins a bit of tirade with one goal in mind: not going to jail.

---

[35] *See* n.66, *infra*.

To start, she says, "I know my rights. Could you please give me my I.D. back, Officer? That's my property. And please, let my [sic] arm. You're making me uncomfortable." As Officer Cinereski begins to call in her driver's license number, she picks back up with, "Officer, I know my rights. Please let me make my call. And, please let go of my arm. I'm a UGA graduate. I work at Deloitte & Touche. I'm a technology consultant . . . . Give me my I.D. back, please." To all of this, Officer Cinereski says, "Sit down." Sanjana, who has been watching all of this unfold from just a few feet away, walks towards a now-seated Catherine, reaches her arm out towards Catherine to console her, but Officer Cinereski stops Sanjana and says, "Okay, I don't need you to touch her. I do need you to back up, please." Sanjana says she's sorry and backs away.

As Officer Cinereski continues with calling in Catherine's driver's license number, Catherine, with her hands behind her back, can be seen scrolling through her cellphone. When Officer Cinereski goes to take it from her, she pulls away and says, "Nope! Uh-uh! No, sir." "Give me your phone," Officer Cinereski commands just before taking it from her hand and telling her, "You are going to jail. You are in custody. You cannot be on your phone for anything like that." Catherine then tells him that he is "violating [her] rights," but he assures her that she'll get her "one phone call when [she] get[s] to the jail" for her arrest on "disorderly conduct."

At Catherine's request, Officer Cinereski puts her phone in her bag, and then she asks, "Can I know why I'm being arrested?" "I told you, disorderly conduct," Officer

11

Cinereski replied. "Disorderly conduct," Catherine asks, "what did I do besides tell my friend he has legal rights?" With no response to her question, Catherine, with eyes wide, looks at Officer Cinereski and tells him, "My dad owns a very big business, and he will get you fired." "Okay, that's great," Officer Cinereski says. Then, Catherine continues, "I know Butch Miller who ran for lieutenant governor." "That's great," Officer Cinereski repeats just before Catherine insists that he "let [her] call [her] lawyer right now." "Okay, look," Officer Cinereski asks, "what's your friend's name?" Unable to answer, Catherine says, "My friend's name? Officer, I don't know. What is his name?" "Okay then," Officer Cinereski says, "you don't have any reason to interject yourself . . . whenever an officer is doing his lawful duty." Catherine then asks, "Why did y'all throw me into cuffs? Why did you throw me into cuffs?" Although Officer Cinereski starts to try and explain why she's being arrested, Catherine begins to talk over him before he can fully answer her question. She says to him, "Officer, I'm very uncomfortable. You're scaring me. You're scaring me, Officer. Please let me make my phone call. Please let me make my phone call." Not being able to respond to her question without interruption, Officer Cinereski gives up trying to explain why she's being arrested.

With her efforts to keep herself out of jail not coming to fruition, she states, "My name is Catherine Elizabeth Slack, and I have rights." Officer Williams then walks up next to where Officer Cinereski is standing and to where Catherine is sitting and says to

her, "You get your phone call when you go to jail." Overlapping with Officer Williams reading Catherine her *Miranda* rights, she asks him why she's going to jail and informs him, in connection with her *Miranda* rights, that she has an attorney. Then, when it comes to contacting her attorney, Officer Williams tells her, "You get that after you go to jail." "Why am I going to jail," she asks yet again. Officer Williams says, "You're going to jail for public intox," and Officer Cinereski says, "Public intox, yes." Again, Catherine firmly maintains that she is not intoxicated and says to Officer Williams, "Breathalyze me right now." To that, Officer Williams informs her, "That's not how public intox works. Public intox is based off your behavior. Breathalyzers are used for DUIs. You're not getting a DUI. You're getting public intox, and that's based off your behavior." Although Officer Willaims wasn't directly involved with physically arresting Catherine after her 14 second interaction with his fellow officers as they questioned the young man, he tells Catherine that her "behavior seemed pretty intoxicated," notwithstanding her vehement denials to the contrary.

In one last effort to change the outcome of her and Sanjana's girls' night, Catherine tells Officer Williams, "I have a disability. You're violating my legal right under the American Disability [sic] Act. I have a spinal cord injury. I need a water right now. I need a water right now, Officer. Get me a water right now." While Officer Williams can be heard saying something about the ADA, he seems to abandon any attempt to further converse with Catherine because she won't stop speaking over him.

At this point, Officer Cinereski remains by Catherine, but Officer Williams walks over to his bicycle. One would hope that would be the end of it, but *au contraire*.

Catherine keeps on, "So, as a Latina woman, you're detaining me rather than this man that I'm trying to help?" Officer Cinereski quickly responds to this by saying, "We're not sitting here about to bring race into all this," and then he radios for transport. Catherine continues to state her concerns about Officer Tucker's snap decision to arrest her "as a woman with a degree from this county that [she] paid thousands and thousands of dollars to." Realizing that at some point her vape pen had fallen under the bench, Catherine stands up, and when Officer Cinereski tells her to "sit down," she asks him, "Could you *please* pick up my vape?" "Sit down." "Could you pick up my vape?" "Sit down." Then, as she's sitting, Catherine asks, "Could you please pick up my vape and put it in my bag?" Officer Cinereski assures her, "We will get all your property, don't worry."

A few seconds of silence pass before Catherine asks Officer Cinereski, "Where is the transport van, Officer?" "They're on their way right now," he tells her. "Okay," Catherine says and asks whether Sanjana will be "with [her]." Officer Cinereski tells Catherine that Sanjana can stand with them "as long as she doesn't try to interject in this as well." "Can she please come with me," Catherine asks, leading Officer Cinereski to tell her, "She's not gonna get in the back of the transport van." "Okay, so once we get to the jail," Catherine asks how soon it'll be until she can make her phone call. "That's

14

gonna be up to the jail," Officer Cinereski tells her.

Sanjana quickly mentions to Officer Cinereski that Catherine's car is parked next to Sanjana's dorm, and Officer Cinereski responds, "Okay. All right." Catherine then says, "I don't drink. I have a spinal cord injury. I suffer from chronic migraines." "Okay," Officer Cinereski said. "Yes," Catherine says while trying to read the name stitched on his uniform, "but thank you for arresting me on public intoxication Cidusky—Cinruski, sorry. I will make sure you are *fired* for discrimination, for violating my rights as a grown woman with a degree—do you have a degree, or did you just go into the academy." "I'm working on it," Officer Cinereski tells her. "Good," Catherine says, "I'm glad you're working on it because maybe you'll learn some more about what you're doing right now. You're violating my rights." "Okay," is all Officer Cinereski says.

Catherine then looks up at him and says, "I make six figures. How much to you make in the academy?" "That's great," he responds. Catherine then says,

> Yeah. Yeah. I will make sure, Cinereski, that your life is, you know, taken care of and you get that degree while you're kicked out of the academy for violating my rights *and* you threw me around. That was actually harassment. I have a hurt hand right now. So, you hurt that. So, my medical malpractice lawyer [sic] *will be* . . . you know.

Throughout all of this, Officer Cinereski merely says, "Okay," to everything she's saying. Then suddenly, we're back on the vape pen.

Catherine asks him, "Can you please get my property off the ground?" "I will as

15

soon as the transport van gets here," he tells her. Then eyeing her bag and her green hat for St. Patrick's Day that had been placed on the opposite side of the bench from her, Catherine, just before standing up—on her own—to move to that side of the bench, says, "Yeah, I'm gonna go closer to my property because I own this." Officer Cinereski immediately takes the hat (with Catherine's bag placed inside it) and says, "You cannot be in possession of your property right now. You are under arrest. If you continue to do this stuff, you're going to get an obstruction charge. Do you understand that?" "What is my charge right now," Catherine asks. Officer Cinereski, with patience running thin, says to her, "I have told you numerous amounts of times." "Please tell me again," she interrupts. Continuing with his statement, Officer Cinereski says, "Just because you're too intoxicated to understand does not mean I have to continue to . . . ." "I'm not intoxicated, and I will pass a Breathalyzer," Catherine adamantly states.

Although Catherine interrupted Officer Cinereski before he could complete his answer to her question, he stopped talking because Officer Tucker, offering to switch places with him, can be seen walking towards them. Officer Cinereski hands the hat and its contents to Officer Tucker and tells him, "That—that's her property. She keeps trying to grab it, go for her phone, and everything else." Then, once more Catherine asks, "Can you please get my vape off the ground? It's my property. I will not touch it Officer Tucker," and in continuing his conversation with Officer Tucker, Officer Cinereski says, "Her vape is on the ground. I told her we could get it as soon as the

16

transport van gets here." From there, Officer Tucker, still holding Catherine's property, stays next to her, and Officer Cinereski begins to walk over to where Officer Williams can be seen writing Catherine's citation.[36]

At this point, it's 1:08:53 on Officer Cinereski's bodycam, but from here, Officer Tucker's bodycam footage provides a better account of what happened. So, switching over to Officer Tucker's bodycam, picking up at 1:08:53, Catherine, now speaking to Officer Tucker, says, "Please can you retrieve it off the ground?" He goes to do so, and Catherine says, "Thank you, Officer." When grabbing her vape pen, Officer Tucker asks, "Are you over 21?" She responds with, "Yes sir, I am," states her name and provides her date of birth. Then, Sanjana walks over and asks Officer Tucker a question about how transport to the jail works, and he instructs her that she "can't get a ride to the jail with [Catherine]" and that she can "just grab an Uber down there." Catherine tells Sanjana, "Yeah, you're gonna have to separate from me. I'll just have to hope my parents answer, and if not, I will have to make bail."

From here, Sanjana tells Catherine, "I'm so sorry. You were just trying to help someone." "No, I know. It's okay," Catherine says. "You'll be okay, okay? You've suffered a lot worse than this," Sanjana assured her. "Oh, I know I have, it's not the first time," Catherine responds. Then, Catherine glances over to a slow-approaching Officer Cinereski and sarcastically says to Sanjana, "Don't get an obstruction charge by telling

---

[36] [Doc. 25-10, Williams Depo., pp. 11:15–16; 11:25—26:1; 13:6—14:24].

me my rights. It's okay." Sanjana says, "Okay," but tells her that she'll wait with her until the transport van arrives.

With Officer Cinereski having made his way back over to the bench and within an earshot of Catherine, she turns to Officer Tucker and says, "Thank you for getting my property after I asked him"—nodding at Officer Cinereski—"multiple times, and he refused." "Well, there was only one officer over here at the time, he couldn't," Officer Tucker tells her. Then, after about 12 seconds of silence, Catherine announces, "And, I will need to affidavit [sic] all the bodycam footage to show how I was thrown around by whoever it was. Um, that will go in my case, too, I wanna be—just be heard right now." About nine seconds later, a concerned Sanjana walks towards a visibly upset Catherine, slightly reaches her hand out to her, and asks, "Are you okay?" Officer Tucker uses his hand to block Sanjana from touching Catherine's shoulder and says, "Hey, can you just do me a favor? Stand back. Don't touch her." "I'm sorry. I'm sorry," Sanjana says backing away. "That's okay. I understand you don't mean anything by it. Some people just try to pass property," Officer Tucker says. Then Catherine, in explaining why her friend tried to console her, says, "I'm just trying not to have a panic attack. I have PTSD. So, you know, it's a bit scary."

Hoping to get Catherine's mind off her arrest, Sanjana brings up something she learned in psychology. "Yeah, exactly," Catherine said agreeably, "perception is reality. That's why I have a BBA. 3.85. I know my rights. My uncle's a lawyer. I know Frank

Lumpkin. As in Lumpkin Street. As in Lumpkin County." Then, Catherine asks Officer

Tucker, "Is my officer, or my—is my I.D. in someone's possession, Officer?" "I'm sure it

is. I think that officer over there is working on the paperwork right now," he responds.

   With the transport van still having not made its way to collect Catherine, she's

left with nothing else to do other than observe passersby in Downtown Athens. She

asks Officer Tucker, "Is he smoking marijuana?" As the person Catherine is asking

about passes, Officer Tucker says, "Is who smoking marijuana? No, that's his cigarette.

What are you? A snitch? What are you doing?" Sanjana chuckles a little at Officer

Tucker's questions, and Catherine says, "I'm just trying to make sure people are taken

care of. . . . Heck no! Mama ain't raise no snitch. She raised a law-abiding citizen that

gets herself in silly situations." Following a brief uneventful period where Catherine

and Sanjana laugh and reminisce about Italy, Catherine says—even though they walked

from Sanjana's dorm to Downtown Athens and even though Sanjana had already told

Officer Cinereski that Catherine's car is parked next to Sanjana's dorm—"I'm glad I'm

designated driver tonight." No one, not even Sanjana, reacts to this comment. For the

next few minutes, Catherine and Sanjana talk about college, and Officer Tucker, at

Officer Cinereski's request, takes the time to ensure that Catherine's cuffs are double

locked, so they don't tighten on her. When checking her cuffs, Officer Tucker tells her,

"If you lean back on them, they can snug up, and they can be very uncomfortable."

   At 1:17:15, from the perspective of Officer Cinereski's bodycam, he says to

19

Officer Tucker, "Do you want to take this one, or do you want me to?" "Oh, I'll write it up," Officer Tucker tells him. "You got it? All right," Officer Cinereski says just before turning off his bodycam. At 1:17:40, Officer Tucker's bodycam shows Officer Cinereski mounting his bicycle and leaving the encounter.

At 1:18:16, Catherine, still seated on the bench and with Sanjana sitting on the ground next to her, tosses a smile at man walking past her. They exchange niceties as he passes to make his way to the crosswalk. "Thank you. You're so sweet," she says to him, "What's your tattoo mean?" Then tilting her left shoulder towards him, she says, "I have a butterfly." From just beside the crosswalk, he walks back over to where Catherine is seated. Before getting too close, though, he gestures to Officer Tucker and asks if it's okay to talk to her. "You just can't touch me," Catherine says, and Officer Tucker tells him, "You just got to keep your distance is all." He backs away, and Catherine asks him, "What's your name?" "Stephen," he responds. The two quickly strike up a conversion about Catherine enlisting in the Army National Guard once he tells her he's in the Army.

About a minute and a half passes until Sanjana can be seen getting up and walking over to an approaching friend. Catherine, who also knows this friend, says, "Mia! Mia!" Catherine turns her torso to show Mia her handcuffs. While this part isn't visible on Officer Tucker's bodycam, Mia has made her way behind Officer Tucker to the side of the bench where Catherine is sitting. "Mia, could you please call my mom,"

20

Catherine asks. As Mia leans over towards Catherine so she can hear her provide her mother's phone number, she starts to dial it. "Back up for me, please," Officer Tucker tells Mia. She does so. "Can I make sure it's right," Catherine asks Mia. When Mia shows Catherine the number she typed into her phone, "No," Catherine laughs, "that's not right." Catherine provides the number again and in reviewing Mia's second effort to correctly type the number tells her, "You put a pound instead of a nine. You're so close." Mia then asks, "What do you mean 'a pound?'" "The hashtag! You accidentally put a hashtag inside the number," Catherine exclaims. "There's no hashtag in it," Mia says. "There is," Catherine reassures her, "Officer Tucker can attest." Sure enough, Officer Tucker confirms that Mia typed a pound sign into the number. "Here, show me the keypad as you do it," Catherine tells Mia. Finally, Mia correctly types the number, and Officer Tucker tells her, "All right, do me a favor. Step back over there." "I'm right here," Mia says. "No, no. Step back," Officer Tucker tells her.

Mia asks Officer Tucker a question to which he replies, "Well, she'll get the chance to make phone calls in like an hour." Then, he tells her, "She's under arrest for public intoxication." "How do you know she's intoxicated," Mia asks. "You guys are both very drunk," Officer Tucker says to Mia. "Okay," Mia says. Officer Tucker tells her, "For example, you dialed a pound instead of a number, and then you, you couldn't tell that you dialed a pound instead of a number. That's how I know you're drunk, for example. Also, your eyes are glassy—watery. You've been drinking *a lot* tonight." "Why

21

are you detaining her," Mia inquires. "No, I'm not detaining her, she's under arrest for public intoxication," Officer Tucker responds. "I'm under arrest for public intoxication though I'm not intoxicated," Catherine tells Mia. Mia then apparently says, "Can I ask fucking why?"

With Catherine's mother having not answered Mia's phone call, Catherine asks Mia, "Could you call my dad? Yeah, he'll get here in 50 minutes." Catherine tells Mia her father's phone number, and Mia dials *a* number. But, as she's taking the phone to her ear, Officer Tucker catches a glimpse of her phone screen and says, "I don't know if that was right." "Pause. My guy. My guy. My guy. You need to stop," Mia says. "No, be nice to Officer Tucker. He's very nice," Catherine tells her. Mia then tries to inform Officer Tucker that there are things about Catherine's health he's not aware of. "I think you misdialed—I think you misdialed the number is what I'm saying," Officer Tucker says to Mia. "Yeah, he's just trying to help," Catherine tells Mia who then shows her phone to Catherine and says, "Tell me that's not you—that's not your dad's number." "It is," Catherine confirms. Mia then laughingly says, "And, oop!"

"Hey, Mr. Slack," Mia says into the phone as she, once again, leans over to Catherine. "I need you to back up and not touch her," Officer Tucker tells Mia as he guides her back with his hand and as she continues to leave a voicemail for Catherine's father. Mia then asks Officer Tucker about Catherine's arrest, and he tells her, "So, I'm not going to discuss her case in depth with you right now." At this point, it appears one

22

of Mia's friends says to her, "Come on. We gotta go," and Officer Tucker says to her, "This is a good plan. Listen to your friend. Y'all be safe. Have a good night." Notably, however, despite how Officer Tucker clearly perceived Mia, she, unlike Catherine, was not arrested for public intoxication.

Moments later, Officer Williams walks over to Officer Tucker and hands him Catherine's still-in-progress citation for him to finish and sign, and Officer Tucker hands him Catherine's property. At 1:26:10, Officer Tucker's bodycam shows Officer Williams saying to Catherine, "All right, we're walking to this car." "Thank you," Catherine kindly says as she stands and walks, with Officer Williams, towards a patrol car for transport to the jail. Officer Tucker then hands the transporting officer Catherine's driver's license and her citation before walking back over to Officer Williams who says, to Sanjana and Stephen, "She's just getting public intox." Officer Tucker confirms, "Just public intox. She probably should catch the obstruction charge, but this is fine." Officer Tucker and Officer Williams convene for a quick recap of what all happened leading up to Catherine's arrest. In the end, though, just before Officer Williams and Officer Tucker mount their bicycles to move to another location, Officer Tucker says, "Perhaps, perhaps we should've charged the obstruction. . . . Bummer."

This admittedly lengthy factual missive is what Catherine relies on to support her federal constitutional and state tort claims against Officer Tucker, Officer Cinereski,

23

and Officer Williams.[37] They, of course, contend that applicable immunity defenses warrant summary judgment for each claim asserted against them. Just to spare you the suspense, not fully. Not when you take the summary-judgment evidence in the light most favorable to Catherine.

## **LEGAL STANDARD**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the [district] court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ.

---

[37] Catherine also asserts a claim for punitive damages, and in connection with her federal and state law claims, respectively, she asserts a claim for attorney's fees under 42 U.S.C. § 1988 and O.C.G.A. § 13-6-11. [Doc. 1, ¶¶ 64–67].

P. 56(c)(1)(A). "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove [her] case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy this burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Id.* at 1315 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

Further, where a party fails to address another party's assertion of fact as required by Rule 56(c), district courts may consider the fact undisputed for purposes of summary judgment. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are

25

jury functions, not those of a judge." *Liberty Lobby, Inc.*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Judges cannot "weigh the evidence and determine the truth of the matter," their only job is "to determine whether there is a genuine issue for trial." *Liberty Lobby, Inc.*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. And, "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at 1263.

## DISCUSSION

By way of a quick roadmap, the Court first addresses Catherine's federal claims—her claims predicated on what she says are an illegal seizure and retaliation for her simply asking the young man whether he called his lawyer and telling him, "Don't answer any questions. Call your dad."[38] Then, after addressing her federal claims, the

---

[38] [Doc. 1, ¶¶ 35–49].

26

Court turns its attention to her state law claim for false imprisonment.[39] Really, for each of Catherine's claims, Officer Tucker, Officer Cinereski, and Officer Williams (collectively referred to as the "Officer Defendants") contend that the undisputed facts show that they had at least arguable probable cause to arrest her that night.[40] While the Officer Defendants may ultimately be right in the end, they'll have to convince a jury on the issue of probable cause. On this record, "competing narratives emerge on key events" surrounding Catherine's arrest on March 16, 2024, such that the Court cannot grant summary judgment for her federal claims. *Sconiers*, 946 F.3d at 1263.

## A.   False Arrest Under the Fourth and Fourteenth Amendments

Under the protections of the Fourth and Fourteenth Amendments of the United States Constitution, Catherine asserts a claim for false arrest pursuant to 42 U.S.C. §

---

[39] In her complaint, Catherine originally asserted state law claims for malicious prosecution and battery in addition to her claims for false arrest and false imprisonment. [*Id.* at ¶¶ 50–63]. However, upon "recogniz[ing]" that such claims are mutually exclusive, *Wilder v. Fisher*, No. 5:20-cv-00143-TES, 2020 WL 5790403, at *3 (M.D. Ga. Sept. 28, 2020), Catherine "abandon[ed] her . . . false arrest and malicious prosecution claim[s]." [Doc. 26, p. 18 (citing [Doc. 25-1, p. 14])]; *see also Sheffield v. Futch*, 839 S.E.2d 294, 300 (Ga. Ct. App. 2020) (quoting *McClendon v. Harper*, 826 S.E.2d 412 (Ga. Ct. App. 2019)) (discussing how "[o]nly one, if any," of the aforementioned causes of actions "will lie as to a particular defendant in particular circumstances"); *Desmond v. Troncalli Mitsubishi*, 532 S.E.2d 463, 466–67 (Ga. Ct. App. 2000) (noting, Georgia law does not look favorably upon false arrest and malicious prosecution claims because its public policy is to encourage citizens to bring to justice those who appear guilty). Catherine also later withdrew her battery claim "as duplicative of the other claims" opting to only pursue her state law claim for false imprisonment on the basis that she was subject to an "unlawful detention." [Doc. 26, pp. 18–19; *see also* [Doc. 26, p. 19 n.7]. Considering this, the Court hopes Catherine's counsel will take a moment to read a footnote previously authored by the Court that applies with equal force and appreciation to them. *Brannen as Tr. of 1996 C. Bishop Brannen III Irrevocable Tr. v. Jackson Nat'l Life Ins. Co.*, 418 F. Supp. 3d 1231, 1233 n.1 (M.D. Ga. 2019).

[40] [Doc. 25-1, pp. 10, 12, 17].

1983.[41] Something many fail to understand is that "[n]ot all deprivations of a right . . . are redressable." *Andre v. Clayton Cnty., Ga.*, 148 F.4th 1282, 1291 (11th Cir. 2025). The doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct does *not* violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010)). "Qualified immunity is more than 'a mere defense to liability.'" *Pace v. Capobianco*, 283 F.3d 1275, 1285 (11th Cir. 2002) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). It is immunity from suit—designed "to absolve government officials from any prolonged litigation practices." *Id.* (citing cases). On this, the Court wants to be crystal clear. Denying the defense is something this Court doesn't take lightly as public officers ought to be free from *undue* interference with their duties and should not have to face potentially disabling threats of liability from the lawful exercise of their obligations. *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019). But, when you look at the facts of this case in the light most favorable to Catherine, the Court finds that the qualified immunity defense just isn't warranted. *Liberty Lobby, Inc.*, 477 U.S. at 255. A jury has to figure this one out.

In this case, Catherine sues the Officer Defendants in their individual capacities.[42] Government officials, like the Officer Defendants, who assert entitlement to qualified

---

[41] [Doc. 1, ¶¶ 35–44].

[42] [Doc. 1, ¶¶ 10–12].

immunity, must first establish that they were acting within the scope of their discretionary authority.[43] *Carter v. Butts Cnty., Ga.*, 821 F.3d 1310, 1319 (11th Cir. 2016).

In their summary-judgment motion, the Officer Defendants contend that their arrest of Catherine was discretionary.[44] Easily enough, Catherine also agrees that the Officer Defendants' testimony shows that they have discretion in making arrests for violations of the public intoxication ordinance.[45] With it undisputed that the Officer Defendants were acting within the scope of their discretionary authority, the burden shifts to Catherine to demonstrate that qualified immunity is inappropriate. *Lee v. Ferraro,* 284 F.3d 1188, 1194 (11th Cir. 2002). Thus, the outcome of her false-arrest claim "turns on whether [the Officer Defendants'] actions violated clearly established Fourth Amendment law." *Green v. Surine*, No. 25-10817, 2026 WL 381376, at *3 (11th Cir. Feb. 11, 2026) (affirming protection of qualified immunity at summary judgment). To overcome the qualified immunity defense—and thus show that it's inappropriate for

---

[43] In her brief opposing summary judgment, Catherine makes a quick reference to the collective knowledge doctrine, arguing that the Officer Defendants "make no argument particularized to one defendant as compared to any other." [Doc. 26, p. 15 n.5]. The doctrine provides that when a group of officers is working on the same investigation, "[p]robable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). Catherine says that because of their "close proximity to each other," the Officer Defendants' "approach" in collectively moving for summary judgment "makes sense." [Doc. 26, p. 15 n.5]. While it's likely that not *all* claims would've applied to Officer Williams, the Officer Defendants—as Catherine points out—did not present their motion for summary judgment in such a manner. [*Id.*].

[44] [Doc. 25-1, p. 16].

[45] [Doc. 26, pp. 5, 7, 16].

this case—requires Catherine to establish both that the Officer Defendants' actions violated a constitutionally protected right and that the right was clearly established at the time of the misconduct. *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002); *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave." *Andre*, 148 F.4th at 1292 (quoting *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991)). In taking a slightly narrower tune towards the particulars of this case, for a person to be seized, her "'freedom of movement' must be restrained 'by means of physical force or a show of authority.'" *Id.* (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

No one disputes that Catherine was arrested or "seized," but that's the easy part. Seizures are unreasonable unless supported by probable cause. *See Green*, 2026 381376, at *3 (citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007)). In addition to probable cause, the existence of arguable probable cause can also hale in the defense of qualified immunity. *Id.* (citing *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010)). So, put simply, the linchpin for this type of Fourth Amendment claim rests on whether arguable probable cause supported an officer's actions. *Green*, 2026 WL 381376,

at *3 (citing *Skop*, 485 F.3d at 1137); *Brown*, 608 F.3d at 734. "[W]hether an officer possesses either actual or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Green*, 2026 WL 381376, at *3 (quoting *Edger*, 84 F.4th at 1237).

"Probable cause to arrest exists if 'the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Carter*, 821 F.3d at 1319. If an officer lacks probable cause to arrest, courts must consider whether *arguable* probable cause supported the arrest at the time. *Id.* (citing *Case v. Eslinger*, 555 F.3d 1317, 1326–27 (11th Cir. 2009)). "If so, the officer is still entitled to qualified immunity, even in the absence of actual probable cause." *Id.*

As for the lower threshold—arguable probable cause—that exists "where reasonable officers in the same circumstances and possessing the same knowledge as [the arresting officer] could have believed that probable cause existed to arrest." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)); *see also District of Columbia v. Wesby*, 583 U.S. 48, 68 (holding, arguable probable cause exists when "a reasonable officer, looking at the entire legal landscape at the time of the arrest[], could have interpreted the law as permitting the arrest[]"). To determine whether an officer had arguable probable cause, courts look to "'whether the officer's actions are objectively

31

reasonable . . . regardless of the officer's underlying intent or motivation.'" *Carter*, 821 F.3d at 1319 (quoting *Lee,* 284 F.3d at 1195). This standard does not shield officers who unreasonably conclude that probable cause exists. *Id.* (citing *Skop*, 485 F.3d at 1137). When an officer makes an arrest without even arguable probable cause, he violates the arrestee's clearly established Fourth Amendment right to be free from unreasonable seizures. *Id.* (citing *Case*, 555 F.3d at 1327).

The reason for Catherine's arrest was, of course, a violation of a local ordinance—that of public intoxication. In seeking summary judgment against her false-arrest claim, the Officer Defendants contend that at least arguable probable cause supported an arrest for public intoxication when she walked towards the young man and asked him if he'd called his lawyer and told him, "Don't answer any questions. Call your dad."[46]

Section 3-5-4 of the Athens Municipal Code states that a publicly intoxicated person is one who:

> shall *be* and *appear* in an intoxicated condition in any public place or within the curtilage of any private residence not his own other than by invitation of the owner or lawful occupant, *which condition is made manifest by boisterousness, by indecent condition or act, or by vulgar, profane, loud or unbecoming language*[.][47]

In their brief and throughout the record, the Officer Defendants state that

---

[46] [Doc. 25-1, p. 3]; [Doc. 25-7, Cinereski Bodycam, 1:02:22–1:02:35].

[47] [Doc. 25-10, p. 39 (emphasis added)]; *see also* [Doc. 26, p. 4 (quoting Athens, Ga., Code § 3-5-4)].

"[a]lthough [they] considered charging [Catherine] with obstruction of justice" in violation of Georgia law, they "charged [her] with the lesser charge of public intoxication . . . ."[48] In opposing their summary-judgment efforts, Catherine contends they lack any evidence that she was "intoxicated" or "engaged in any illicit manifestation of intoxication"—which is her way of saying that she was neither actually intoxicated nor did she even appear intoxicated, both of which are required by the ordinance.[49] Despite arresting Catherine for violating a municipal ordinance that, in its text, literally defines an intoxicated person as one who is actually intoxicated, the Officer Defendants nonetheless argue that "it is irrelevant . . . whether she was actually 'drunk.'"[50] That, however, likely depends on whether one is analyzing the presence of arguable probable cause for an arrest or if there is sufficient evidence for a conviction. In this civil case, the Court isn't concerned with a criminal conviction.[51] So, it doesn't matter whether Catherine was actually drunk. What matters is whether the Officer Defendants had at least arguable probable cause to believe she violated the municipal ordinance in question so that they could legally arrest her.

To support their position that only their "observation" of Catherine matters in

---

[48] [Doc. 25-1, p. 2].

[49] [Doc. 26, p. 1].

[50] [Doc. 25-1, p. 14].

[51] *But see* [*id.* (the Officer Defendants' argument concerning how the local ordinance doesn't mention "a specific blood alcohol level to be guilty of public intoxication")].

determining probable cause, the Officer Defendants summarily represent that "the facts as a whole *establish* [that she] was loud and boisterous" in violation of the local ordinance.[52] Even in accepting their correct assessment of the relevant "reasonableness" inquiry to determine probable cause, the Court's not so sure about their argument that the undisputed facts definitively establish "loud and boisterous" behavior from Catherine or that she was "gesticulating" in those 14 seconds leading up to her arrest in one of the ways mandated by the ordinance.[53] *See Heien v. North Carolina*, 574 U.S. 54, 61 (2014) (quoting *Riley v. California*, 573 U.S. 373, 134 (2014)); *see also Collins v. Ensley*, No. 2:09-CV-00204-WCO, 2011 WL 13176425, at *8 (N.D. Ga. Sept. 15, 2011) ("There is a dispute of material fact, however, about whether [the nonmovant] was loud, boisterous, or using profane language. [The nonmovant] testified that he was not boisterous or loud and that he never used profane language during his encounter with the police. Although [the movant] contradicts [the nonmovant's] testimony, the court must credit [the nonmovant's] evidence at this stage in the proceedings.") (citing *Liberty Lobby, Inc.*, 477 U.S. at 255).

The Court's concerns with how the bodycam footage contradicts the Officer Defendants' deposition testimonies about Catherine being intoxicated in public should come as no surprise to the parties. During the Court's review of this record, it has

---

[52] [Doc. 29, p. 3 (emphasis added)].

[53] [Doc. 25-1, pp. 5–6].

34

already told them that "[a]t a minimum, there's an issue of fact as to whether actual or

arguable probable cause supported Catherine's arre[s]t for public intoxication."[54] To

recap, the Court told the parties:

> On review, much of Officer Tucker's deposition testimony—that Catherine
> shouted (in a manner unnecessary to overcome the loudness of Downtown
> Athens); waved her arms; and exhibited "loud, boisterous, unbecoming
> behavior"—is simply not supported by the limited views of the [bodycam]
> footage. [*See, e.g.*, [Doc. 25-6, Tucker Depo., pp. 20:20—21:6; 21:22—23:3;
> 35:21—36:2; 52:8:12]; *see also* [Doc. 25-5, Cinereski Depo., p. 32:21 (Officer
> Cinereski testifying, "It's loud out there.")]]. "Where the video obviously
> contradicts [an offered] version of the facts, [courts] accept the video's
> depiction instead of [the] account" offered. *Pourmoghani-Esfahani v. Gee*, 625
> F.3d 1313, 1315 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 380
> (2007)). "When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could
> believe it, a court should not adopt that version of the facts for purposes of
> ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.
>
> Further, with respect to Catherine's gait, Officer Cinereski testified that he
> didn't know if she was "trying to keep her balance or if [she was just]
> turning around." [[Doc. 25-5, Cinereski Depo., p. 30:19–25]]. Officer
> Cinereski also testified in his deposition that in the "little bit" of [bodycam]
> footage he reviewed, he "didn't hear any slurred speech" from Catherine.
> [[*Id.* at p. 32:12–17]]. Lastly, Officer Williams testified that Catherine simply
> telling the young man who was being questioned by Officer Tucker and
> Officer Cinereski, "Don't answer any questions. Call your dad," was not in
> and of itself unbecoming language. [[Doc. 25-10, Williams Depo., pp.
> 51:24—52:3]]. These, of course, are just a few of the many instances where
> the evidence supports Catherine's position that she wasn't intoxicated and
> didn't even *appear* to be intoxicated.
>
> When it comes to alcoholic drinks, Catherine and Sanjana's deposition
> testimonies show that Catherine, in about a four-hour timespan, drank the
> Obomb at Dooley's, either sipped on a beer at Up Dawg *or* consumed a

---

[54] [Doc. 30, pp. 6-7 (first citing *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007); and then citing *Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020))].

Twisted Tea at 1785, and was offered a sip of Sanjana's margarita at Sandbar. [[Doc. 25-3, Ayyappan Depo., pp. 19:7–21; 22:18–20]; [Doc. 25-4, Slack Depo., pp. 32:1—33:15; 35:7–10; 36:19–25; 40:9–11; 40:24—41:3; 42:4–5; 44:14–25]]. With that, it must be remembered that on summary judgment, "[t]he evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [her] favor." [*Liberty Lobby, Inc.*, 477 U.S. at 242].[55]

The Officer Defendants pin qualified immunity on their observations of Catherine's "behavior and actions" and how "that would have led any reasonable officer to arrest her for public intoxication."[56] Catherine, however, argues that "[e]ach of [the Officer] Defendants' supposedly inculpatory facts are disputed by testimony and belied by video."[57] To this, the Court has already found that under the applicable standards for assessing evidence on summary judgment, it's inclined to agree with Catherine with respect to the existence of a material factual dispute on the Officer Defendants' inculpatory facts underlying her arrest for public intoxication.[58] Frankly, the bodycam footage doesn't support how the Officer Defendants portray Catherine's behavior, her gait, or her speech in the moments leading up to her arrest for public intoxication, and "[p]robable cause is measured at the time of the arrest, not at some time before or after." *Davis v. City of Apopka*, 78 F.4th 1326, 1333 n.3 (11th Cir. 2023).

---

[55] [Doc. 30, pp. 3–5].

[56] [Doc. 25-1, p. 9].

[57] [Doc. 26, p. 1].

[58] [Doc. 30, p. 6].

True, Catherine may have been loud and boisterous from the sheer fact that she'd been arrested, or "grumpy," to use Officer Tucker's phrasing, but her post-cuff behavior—undoubtedly cringe and embarrassing as some parts of it may have been—cannot be used to bank probable cause for an arrest based on public intoxication.[59] *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.")

In playing its hand early, the Court also noted that each of the Officer Defendants testified in their respective depositions about how Catherine's actions could've supported—and these are their words, not the Court's—"obstruction of justice, a felony."[60] This, of course, ushers in the any-crime rule previously noticed by the Court during its consideration of the parties' summary-judgment arguments. *Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). Given that the Officer Defendants did not argue the any-crime rule in seeking summary judgment on Catherine's false-arrest claim, the Court, as required by Rule 56(f)(2), ordered the parties to brief it since it presents a possible avenue for summary judgment "not raised

---

[59] [Doc. 25-4, Slack Depo., pp. 102:23—103:8 (Catherine's deposition testimony that she "would have treated the officers with a bit more compassion in some of the things [she] said")]; [Doc. 25-6, Tucker Depo., p. 28:10–16].

[60] [Doc. 25-1, p. 2]; [Doc. 30, p. 7]; *see e.g.*, [Doc. 25-5, Cinereski Depo., p. 36:7–14]; [Doc. 25-6, Tucker Depo., pp. 29:5; 52:20—53:10]; [Doc. 25-10, Williams Depo., pp. 57:8—59:9].

by a party."[61] Fed. R. Civ. P. 56(f)(2).

In her response to the Court's notice and order to brief the any-crime rule, Catherine "humbly requests" the Court to "adhere to the principle of party presentation."[62] Before continuing with its discussion, the Court takes a brief, but necessary, detour to thoroughly address this issue of party presentation as it applies in this case.

Essentially, Catherine argues that because the Officer Defendants didn't think to brief the any-crime rule, the Court should altogether reject its application to her case.[63] Pointing to a very recent Supreme Court decision, Catherine notes for the Court that federal courts have to "adhere to the principle of party presentation." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026).

In *Margolin*, the Supreme Court stated that the principle of party presentation rests on a "points not argued will not be considered" premise that "distinguishes our adversarial system of justice from an inquisitorial one." *Id.* (quoting *States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring in judgment)). Stressing that courts are "essentially passive instruments of government," the Supreme Court says that lower courts need to rely on the parties to "frame the issues for decision" and decide cases

---

[61] [Doc. 30, pp. 1, 8].

[62] [Doc. 32, p. 2].

[63] [*Id.* (quoting *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (May 26, 2026) (per curiam))].

"only the questions presented." *Id.* (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020). *However*, and this is important, in *Margolin*, the Supreme Court's admonition of lower courts that "grant[] relief" on grounds not raised by a party comes about when a party "never asserted [those grounds] *and* [the opposing party] never had the chance to address" them. *Id.* (emphasis added). Here, the Court—as required by a *Federal Rule of Civil Procedure* blessed by Congress—notified the parties of its concerns about the any-crime rule, and, to further pull this case's procedural history from the principle of party presentation, Catherine "had" and took advantage of "the chance to address" the Court's inquiry.[64] *Id.*; Fed. R. Civ. P. 56(f)(2).

Catherine also asserts that the Officer Defendants waived any consideration of the any-crime rule.[65] The Court can't agree. It's true that "federal courts do not have '*carte blanche* to depart from the principle of party presentation basic to our adversary system'" and that the Eleventh Circuit has deemed it an "abuse of discretion" for a court "to override a [party's] deliberate waiver." *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022). Here, though, the Court can't say that the Officer Defendants' failure to argue the any-crime rule to begin with was a deliberate waiver. Of course, they didn't think to or may have decided not to put forth the any-crime rule without the Court bringing it up, but any reasonable reading of the Officer Defendants' depositions

---

[64] *See generally* [Doc. 32].

[65] [Doc. 32, p. 2 (citing *United States v. Campbell*, 26 F.4th 860, 872 (11th Cir. 2022))].

would deduce that the evidence is full of instances about how they thought Catherine should've been tagged with an obstruction charge as well.[66] Now, evidence isn't argument just as argument isn't evidence, but the record is brimming with testimony that warrants discussion of the any-crime rule. *Bryant v. United States Steel Corp.*, 428 F. App'x 895, 897 (11th Cir. 2011) (holding, "counsel's argument is not evidence").

Cases like this one are exactly why Rule 56(f)(2) exists: so that parties can, most importantly, have adequate notice and a fair opportunity to address—and this is from the text of Rule 56 itself—"grounds *not raised* by a party" that may require summary judgment. Fed. R. Civ. P. 56(f)(2) (emphasis added). The aim of Rule 56(f)(2) is to prevent ambush—ambush by courts that grant summary judgment on surprise grounds that were not raised by a movant and on which the nonmovant never had an opportunity to confront. *See Roe v. City of Atlanta*, 456 F. App'x 820, 821 (11th Cir. 2012).

Lastly, the Supreme Court's words of caution regarding the principle of party presentation, while heeded, simply don't pertain to this case. *See Margolin*, 146 S. Ct. at 1288. The Court has not ambushed Catherine with its consideration of the any-crime rule nor did it strip from her any opportunity to address it. Despite her arguments to the contrary, district courts are "permitted to raise new issues in deciding a motion for summary judgment," so long as they "give notice to the parties." *Roe*, 456 F. App'x at

---

[66] *See* [Doc. 32, p. 4 (Catherine's counsel's assumption that the Officer Defendants did not argue the any-crime rule due to the factual dispute about whether Officer Cinereski gave a Catherine a lawful command or merely made a request that she "was not obligated to follow under penalty of arrest")].

822. The Court did so in this case.

To acquiesce to Catherine's humble request would not only consign Rule 56(f)(2) to the trash bin and render it virtually useless, but it would cause the Court to issue a ruling without discussion of applicable law. The any-crime rule—although the Officer Defendants clearly didn't raise it on their own—is the law in the Eleventh Circuit, and the Court is in no place to ignore it. To ignore it, as Catherine urges the Court to do, presents an invitation for the Court to issue a ruling that completely snubs binding precedent that needs to be considered, and that's something this Court's not going to intentionally do.

That said, what is the any-crime rule, and how does it pertain to Catherine's false-arrest claim? The any-crime rule "insulates officers from false-arrest claims so long as probable cause existed to arrest the suspect *for some crime*, even if it was not the crime the officer thought or said had occurred." *Williams*, 965 F.3d at 1158 (citing *Lee*, F.3d at 1195–96) (emphasis added). "So long as the circumstances known to the officers, viewed objectively, give probable cause to arrest for any crime, the arrest is constitutionally valid even if probable cause was lacking as to some offenses, or even all announced charges." *Elmore v. Fulton Cnty. Sch. Dist.*, 605 F. App'x 906, 914 (11th Cir. 2015) (per curiam) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). In other words, even though the Officer Defendants may not have had probable cause to arrest Catherine for public intoxication, might they have had it for obstruction?

41

Remember, "whether an officer possesses either actual or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Green*, 2026 WL 381376, at *3 (quoting *Edger*, 84 F.4th at 1237). However, with deference to the any-crime rule, the Court would adjust that setting to this: Whether an officer possesses either actual or arguable probable cause depends on the elements "for some crime" and the operative fact pattern. *Id.*; *Williams*, 965 F.3d at 1158. Since the Officer Defendants argue that they "considered charging [Catherine] with obstruction of justice, a felony," let's look at Georgia's obstruction statute.[67]

First, with respect to the Officer Defendants' position that they considered charging Catherine with *felony* obstruction, that would have to be a charge under either O.C.G.A. § 16-10-24(b) or (c).[68] Under § 16-10-24(b), Georgia law states, "Whoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer . . . in the lawful discharge of his or her official duties *by offering or doing violence* to the person of such officer or legally authorized person shall be guilty of a felony." O.C.G.A. § 16-10-24(b) (emphasis added). Clearly, under the operative fact pattern for this case, there was no probable cause or arguable probable cause to support an obstruction-based arrest under § 16-10-24(b).[69] Then, under § 16-10-24(c), Georgia makes it a felony for

---

[67] [Doc. 25-1, p. 2].

[68] [*Id.*].

[69] [Doc. 32, pp. 2–3].

anyone who "knowingly and willfully resists, obstructs, or opposes any law enforcement officer . . . in the lawful discharge of his or her official duties by knowingly and willfully *throwing, projecting, or expelling human or animal blood, urine, feces, vomitus, or seminal fluid* on or at such individual . . . ." O.C.G.A. § 16-10-24(c) (emphasis added). Again, absolutely nothing in the operative fact pattern for this case supports either probable-cause determination for an arrest under § 16-10-24(c).[70] This, of course, leaves § 16-10-24(a), but a violation of that statute is not a felony. It's a misdemeanor.

Under § 16-10-24(a), Georgia law states that "a person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor." In her efforts to overcome the Officer Defendants' assertion of qualified immunity, Catherine argues that "[e]ven arguable probable cause is lacking" for an arrest under § 16-10-24(a) "especially when taking *the disputed facts* in the light most favorable to [her]" at summary judgment.[71]

In support of an arrest for obstruction, the Officer Defendants direct the Court to the several occasions in their testimony that speak to how Catherine "interfered and interrupted" or hindered Officer Tucker from doing his job when it came to questioning the young man.[72] Officer Tucker testified that "initially," he thought Catherine "was

---

[70] [Doc. 32, pp. 2–3].

[71] [*Id.* at p. 3 (emphasis added)].

[72] [Doc. 31, p. 4].

43

obstructive" because "[s]he was going out and seeking confrontation with people."[73] Officer Cinereski testified that Catherine got "right up on Officer Tucker" and that's when "[they] decided to affect the arrest."[74] Outside of his deposition testimony, Officer Cinereski can be heard on his bodycam telling Catherine that she didn't "have any reason to interject [her]self . . . whenever an officer is doing his lawful duty." Then, Officer Williams testified that if Catherine had "said the same things that she said from a different distance . . . her conduct would potentially *not* have given rise to probable cause for obstruction."[75] Officer Williams also was very clear in his deposition testimony that Officer Tucker and Officer Cinereski "had probable cause for possible obstruction because of [Catherine] repeatedly disobeying commands."[76]

Now, there's no need to rehash what we already know from the bodycam footage—Officer Cinereski can clearly be heard saying to Catherine, "Hey, ma'am? Can you just go ahead and walk away right now?" Catherine clings to how Officer Cinereski said what he did—"*Can* you . . . "—in her arguments opposing summary judgment for her false-arrest claim. This, of course, circles us back to the parties' critical dispute as to whether Officer Cinereski gave Catherine a lawful order or merely a request to "walk

---

[73] [Doc. 25-6, Tucker Depo., pp. 28:10–13; 29:4–5].

[74] [Doc. 25-5, Cinereski Depo., p. 35:11–18].

[75] [Doc. 25-10, Williams Depo., p. 58:8–15 (emphasis added)].

[76] [*Id.* at p. 57:5–12].

away."[77] After all, "[a] person's refusal to comply with an officer's lawful command constitutes obstruction under Georgia law." *Bristol v. Butts Cnty., Ga.*, No. 5:24-cv-00137-TES-CHW, 2024 WL 3558737, at *7 (M.D. Ga. July 24, 2024) (citation omitted).

Catherine, obviously, argues that what Officer Cinereski said to her was a request and that he only uttered his request once before her arrest.[78] What's more, even Officer Tucker testified in his deposition, "No. Maybe not. I don't know," when asked whether he would consider what Officer Cinereski said to Catherine to "constitute a lawful command."[79] Surely, if an officer involved doesn't know whether his fellow officer gave a request or a command, reasonable jurors could easily disagree that someone "willfully obstruct[ed] or hinder[ed] a law enforcement officer . . . in the lawful discharge of his or her official duties." O.C.G.A. § 16-10-24(a). Compare that with Catherine's take and Officer Cinereski's deposition testimony about how—even though he was "asking . . . nicely" so as to not "com[e] off brunt" and "elevate the situation"— what he said "could still be a [lawful] command," and *there's* the all-important factual dispute in this case that the Court can't decide.[80] The Court is not at "liberty to pick which side [it] think[s] is more credible." *Sconiers*, 946 F.3d at 1263. For instance, an

---

[77] *See* n.66 *supra.*

[78] [Doc. 32, p. 4].

[79] [Doc. 25-6, Tucker Depo., p. 45:7–12].

[80] [Doc. 25-5, Cinereski Depo., pp. 17:7—18:3].

officer may ask an individual, "Can I see your I.D.?" If the individual says, "No," he hasn't refused a lawful command, he's simply answered the officer's question.

On the whole, even when considering the any-crime rule for misdemeanor obstruction under § 16-10-24(a), a reasonable jury could absolutely find that Officer Cinereski merely gave Catherine a request to "walk away" and that, in turn, could cause a reasonable jury to decide there wasn't any probable cause to arrest Catherine. *Id.* Catherine testified that if Officer Cinereski "would have given [her] a clear instruction" that she "understood," then she "would have complied with it."[81] Whether that's true? Again, not for the Court to decide. *See id.* How the jury perceives Officer Cinereski's communication to Catherine and her response to it will determine her success on her false-arrest claim under § 1983.

To frame it as simply as possible, if the jury believes that Catherine was intoxicated (as defined in the Athens-Clarke County ordinance) *or* if the jury finds that what Officer Cinereski said to her constituted a lawful command that she refused to obey in the 10 seconds before she was arrested, then there was at least arguable probable cause to arrest her, and her false-arrest claim will crumble. If, however, the jury sides with Catherine and her unflinching position that she was not intoxicated *and* finds that Officer Cinereski's words were nothing more than a request that she "walk away," then "there was never any command" by any of the Officer Defendants and no

---

[81] [Doc. 25-4, Slack Depo., p. 113:12–17].

probable cause to arrest her. *Williams*, 965 F.3d at 1158; *Bristol*, 2024 WL 3558737, at *7.

Given that genuine issues of material fact remain, the Court must **DENY** the Officer

Defendants' qualified immunity in their effort to obtain summary judgment on

Catherine's false-arrest claim under the Fourth and Fourteenth Amendments. *Sconiers*,

946 F.3d at 1263.

"[Q]ualified immunity protects the police . . . but only up to the line defined by

the arguable probable cause standard." *Toole v. City of Atlanta*, 798 F. App'x 381, 383

(11th Cir. 2019) (affirming denial of qualified immunity where, in "[r]eading the facts in

the light most favorable" to the nonmovant, neither probable cause nor arguable

probable cause supported an arrest) (quoting *Skop*, 485 F.3d at 1144). "So, in a situation

where 'the resolution of disputed critical facts determines on which side of this line the

officer's conduct fell, summary judgment is inappropriate,' and a plaintiff is 'entitled to

have [her] case heard by a jury.'" *Id.*

### B.    Retaliation Under the First Amendment

Now, onto the First Amendment. Whether the Officer Defendants violated a

clearly established right, the Eleventh Circuit has made short work of this inquiry by

holding: "[W]e've established that law enforcement officers may not arrest an

individual as a way 'to thwart or intrude upon First Amendment rights otherwise being

47

validly asserted.'" *Id.* at 387 (quoting *Kelly v. Page*, 335 F.2d 114, 119 (5th Cir. 1964)).[82]

Protected speech includes verbal opposition and criticism directed at police officers.

*Hill*, 482 U.S. at 462–63 & 463 n.12. Arresting, or even threatening to arrest, someone for

engaging in protected speech constitutes an adverse effect on the speech itself. *Andrews*

*v. Scott*, 729 F. App'x 804, 812 (11th Cir. 2018) (per curiam). In sum, it is clearly

established that the First Amendment forbids arresting someone for engaging in

constitutionally protected speech, such as verbally opposing or criticizing police

conduct. *Ga. Ass'n of Educators v. Gwinnett Cnty. Sch. Dist.*, 856 F.2d 142, 145 (11th Cir.

1988); *Lambert v. Herrington*, No. 21-10452, 2022 WL 2345769, at *6 (11th Cir. June 29,

2022) (per curiam).

That said, when it comes to Catherine's retaliation claim under the First

Amendment brought against the Officer Defendants pursuant to § 1983, neither side

really squabbles with what she must establish to state such a claim. In their motion for

summary judgment, the Officer Defendants contend that to state a First Amendment

retaliation claim under § 1983, Catherine must show that her speech was

constitutionally protected, that the Officer Defendants' retaliatory conduct adversely

affected her protected speech, and that there is a causal connection between the

---

[82] The decisions handed down prior to the close of business on September 30, 1981, by the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth') "shall be binding as precedent in the Eleventh Circuit" for the court of appeals, the district courts, and the bankruptcy courts. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

retaliatory conduct and the protected speech.[83] In citing cases from 2019 and 2023, the Officer Defendants contend, and Catherine agrees, that "the probable cause standard, rather than arguable probable cause, *appears* to be used" for a retaliatory arrest claim under the First Amendment based on "recent *published* opinions."[84] *See, e.g.*, *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019). Reyling on the Eleventh Circuit's ruling in *Turner v. Williams*, the Officer Defendants argue that "[i]n view of the 'but-for' cause requirement for a First Amendment retaliatory arrest claim, the Supreme Court has instructed that a plaintiff 'must plead and prove the absence of probable cause for the arrest.'"[85] 65 F.4th 564, 581 (11th Cir. 2023) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) (holding, "[a] plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest")). However, as discussed at length above, Catherine and the Officer Defendants couldn't disagree more on the presence or absence of probable cause, and as the Court has already stated, there's a genuine factual dispute on that very issue. Thus, the Officer Defendants aren't automatically entitled to qualified immunity on Catherine's retaliation claim.

---

[83] [Doc. 25-1, pp. 8–9 (citing *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019))].

[84] [*Id.* at p. 8 n.4 (citing *DeMartini*, 942 F.3d at 1294–95)]; [Doc. 26, p. 15 n.6].

[85] The Court notes that it does not rely on the Eleventh Circuit's apparent application of arguable probable cause in *Toole v. City of Atlanta*, an unpublished decision, for Catherine's retaliation claim under the First Amendment. 798 F. App'x 381, 387 (11th Cir. 2019) (ruling, "[W]hen an officer has arguable probable cause to arrest, he is entitled to qualified immunity both from Fourth Amendment claims for false arrest and from First Amendment claims stemming from the arrest") (citing *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018)); *see also* [Doc. 25-1, p. 8 (citing *DeMartini*, 942 F.3d at 1294–95)]; [Doc. 26, p. 15 n.6].

In briefing their respective arguments for and against summary judgment, the parties focus heavily on something referred to as the *Nieves* exception for First Amendment retaliation cases. What the Supreme Court dubs "a narrow qualification," the *Nieves* exception "is warranted for circumstances where officers *have* probable cause to make arrests[] but typically exercise their discretion not to do so." *Nieves*, 587 U.S. at 406 (emphasis added). The exception must be based on "objective evidence" from a plaintiff showing that she "was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 407.

Catherine, of course, would point to Mia and how Officer Tucker let her walk away scot-free knowing very well that she was in public and in his words, "very drunk."[86] The most discernable difference between the two (from Officer Tucker's standpoint) is that Mia didn't offer advice to Catherine like Catherine did to the young man. From the bodycam footage, Mia can certainly be heard asking many more questions than Catherine did. Not only that, but Officer Tucker told Mia to step away from Catherine many more times, and Mia was given much more than 10 seconds to do so. Similarly, Catherine could just as easily point to the young man and how Officer Tucker helped him call an Uber notwithstanding his deposition testimony that the young was more intoxicated than Catherine "by a wide margin" because he almost

---

[86] [Doc. 26, pp. 15–18].

walked in front of a car.[87] However, the *Nieves* exception only applies "where officers have probable cause," and as should be clear by now, that issue is up in the air. *Id.* at 406. Accordingly, the Court **DENIES** the Officer Defendants' efforts to automatically obtain qualified immunity for Catherine's First Amendment retaliation claim.

## C.    False Imprisonment Under Georgia Law

This brings us to Catherine's final claim—a tort claim under Georgia law against the Officer Defendants based on what happened to her as she and Sanjana began to walk back to Sanjana's dorm. As the Court will explain below, her claim for false imprisonment turns on whether the Officer Defendants performed a discretionary duty with actual malice and an intent to cause injury. Ga. Const. art. I, § II, para. IX(d).

"Georgia's doctrine of official immunity—much like qualified immunity under federal law—'offers public officers and employees limited protection from suit in their personal capacity.'" *Bohanan v. Paulding Cnty., Ga.*, 479 F. Supp. 3d 1345, 1364 (N.D. Ga. 2020) (quoting *Gilbert v. Richardson*, 452 S.E.2d 476, 481 (Ga. 1994)). "Unlike qualified immunity under federal law," however, courts "must inquire into [the officer's] subjective intent to determine whether he has official immunity under Georgia law." *Jordan v. Mosley*, 487 F.3d 1350, 1357 (11th Cir. 2007). Official immunity flows directly from the Georgia Constitution, which provides that state officers and employees

> may be subject to suit and may be liable for injuries and damages caused
> by the negligent performance of, or negligent failure to perform, their

---

[87] [*Id.* at p. 16 (quoting [Doc. 25-6, Tucker Depo., p. 25:25—26:7])]; [Doc. 25-6, Tucker Depo., p. 18:21–22].

51

ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions.

Ga. Const. art. I, § II, para. IX(d); *see also Gilbert*, 452 S.E.2d at 481, 483. Thus, as just touched on, the key focus for Catherine's claim for false imprisonment is whether the Officer Defendants acted with "actual malice or intent to cause injury" while they performed their "official functions." *Gilbert*, 452 S.E.2d at 483.

Georgia's courts interpret the term "official functions" to mean "any act performed within the officer's . . . scope of authority, including both ministerial and discretionary acts." *Id.* "Whether an official's act is ministerial or discretionary is determined based on the facts of each case." *Speight v. Griggs*, 579 F. App'x 757, 759 (11th Cir. 2014) (citing *Grammens v. Dollar*, 697 S.E.2d 775, 777 (Ga. 2010)). "A ministerial act is commonly one that is simple, absolute, and definite, arising under conditions admitted or proved to exist, and requiring merely the execution of a specific duty." *Grammens*, 697 S.E.2d at 777 (citation omitted). A discretionary act, on the other hand, "calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Id.*; *Barnett v. Caldwell*, 809 S.E.2d 813, 816 (Ga. 2018) (quoting *Murphy v. Bajjani*, 647 S.E.2d 54, 57 (Ga. 2007)).

When asserting a state law claim involving a discretionary act, like the one Catherine asserts here, Georgia law unquestionably requires a plaintiff to allege

52

"[a]ctual malice." *Adams v. Hazelwood*, 520 S.E.2d 896, 898 (Ga. 1999); *Murphy*, 647 S.E.2d at 60 (quoting *Merrow v. Hawkins,* 467 S.E.2d 336, 338 (Ga. 1996)); *Barnett*, 809 S.E.2d at 816 (reaffirming, "'discretionary' acts are only subject to suit when performed with actual malice or intent to cause injury"). The Georgia Supreme Court says that "actual malice"—as it's used in Georgia's constitution—denotes "express malice," which is a deliberate intention to do wrong. *Murphy*, 647 S.E.2d at 60 (quoting *Merrow*, 467 S.E.2d at 338). It does not include "implied malice," which is the reckless disregard for the rights of others. *Id.*

Under Georgia law, false imprisonment is "the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51-7-20. The only elements required to plead false imprisonment are an allegation of detention and an allegation that the detention was unlawful. *Malone v. Johnson*, 667 F. Supp. 3d 1257, 1273–74 (N.D. Ga. 2023) (citing *Collier v. Evans*, 406 S.E.2d 90, 92 (Ga. Ct. App. 1991)). Catherine pled those elements, so the inquiry narrows to whether she *alleged* facts to demonstrate that the Officer Defendants acted with actual malice to overcome an assertion of official immunity under Georgia law.[88] *Murphy*, 647 S.E.2d at 60 (holding, a plaintiff must "allege the actual malice necessary to overcome official immunity for discretionary acts"); *see also Malone*, 667 F. Supp. 3d at 1274 (first citing *Kidd v. Coates*, 518 S.E.2d 124, 125 (Ga. 1999); and then citing *Daniels v. Gordon*, 503

---

[88] [Doc. 1, ¶¶ 51–52].

S.E.2d 72, 75 (Ga. Ct. App. 1998)).

Actual malice requires "more than harboring bad feelings or ill will about another; rather, ill will must also be combined with the intent to do something wrongful or illegal." *Malone*, 667 F. Supp. 3d at 1274 (quoting *Wyno v. Lowndes Cnty.*, 824 S.E.2d 297, 304 (Ga. 2019)) (cleaned up). Proof of ill will alone is not enough. *Adams*, 520 S.E.2d at 898. Similarly, an "actual intent to cause injury" means the "actual intent to cause harm to [an individual], not merely an intent to do the act purportedly resulting in the claimed injury." *Malone*, 667 F. Supp. 3d at 1274 (quoting *Kidd*, 518 S.E.2d at 125). True, "[m]alice *may be inferred* from a total lack of probable cause," but that alone does not support an automatic inference that an officer acted with actual malice. *Wills v. Arnett*, 702 S.E.2d 646, 648 (Ga. Ct. App. 2010) (emphasis added); *Davis v. Lang*, 706 F. App'x 551, 557 (11th Cir. 2017) (citing *Anderson v. Cobb*, 573 S.E.2d 417, 419 (Ga. Ct. App. 2002)). A plaintiff must show that a defendant acted with deliberate intent to do a wrongful act. *See Murphy*, 647 S.E.2d at 60.

With respect to her claim for false imprisonment, Catherine alleges that her arrest "was made with actual malice, such that official immunity does not apply."[89] Such a bare allegation, though, is about as conclusory as you can get, and in order to overcome summary judgment a nonmovant cannot solely rely on allegations presented in a pleading. *See First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). To

---

[89] [Doc. 1, ¶ 53].

survive summary judgment, a nonmovant must point to "relevant and admissible evidence beyond the pleadings." *Josendis*, 662 F.3d 1315 (citing *Celotex*, 477 U.S. at 324). Also, in her complaint, Catherine alleges that her arrest and imprisonment "was made without probable cause."[90] But, under Georgia law, that alone is insufficient. *Davis*, 706 F. App'x at 559 (citing *Cobb*, 573 S.E.2d at 419).

Then, in going "beyond" the contents of her pleading, Catherine points to Officer Tucker's statements made in his field report as the foundation for her position that actual malice exists in this case.[91] *Josendis*, 662 F.3d 1315 (citing *Celotex*, 477 U.S. at 324). Following his encounter with Catherine, he wrote: "[Catherine] was clearly very intoxicated as made evidence by her glassy, watery eyes, slurred speech, and unsteadiness on her feet[.] [She] was cited and arrested for public intoxication as her behavior was *so boisterous and indecent* as to constitute good grounds for an obstruction charge."[92] Catherine testified in her deposition that she "can't speak for how [the Officer Defendants] were feeling" that night, but she contends that "[a] reasonable jury could find" that the statements Officer Tucker "used to justify [her] arrest are not the product of any mere difference of opinion or perception."[93] "Instead," she argues, "a jury could

---

[90] [Doc. 1, ¶ 52]; *see also* [Doc. 26, p. 18 (Catherine's contention that actual probable cause, rather than arguable probable cause, is the relevant inquiry in an official-immunity analysis)].

[91] [Doc. 26, p. 19 (quoting [Doc. 25-8, p. 2])].

[92] [Doc. 25-8, p. 2 (emphasis added)].

[93] [Doc. 25-4, Slack Depo., p. 103:20–23]; [Doc. 26, p. 19].

find [Officer Tucker's] statements to be knowing untruths."[94]

Inaccuracies and mistakes, though, constitute *negligent actions*, and those alone also "cannot sustain a finding of actual malice." *Davis*, 706 F. App'x at 559–60; *see also Merrow*, 467 S.E.2d at 337–38 (holding, for purposes of official immunity, actual malice does not include even acts taken with reckless disregard for the rights of others). The Eleventh Circuit, in assessing Georgia law, has "stress[ed] that because 'actual malice' does not include 'implied malice,' . . . court[s] [should] not 'speculate [or] make assumptions' about improper motive" as "a mere 'inference of malice is insufficient to overcome [the] immunity defense.'" *Croland v. City of Atlanta*, 782 F. App'x 753, 759 (11th Cir. 2019) (quoting *Watkins v. Latif*, 744 S.E.2d 860, 863 (Ga. Ct. App. 2013); and *Conley v. Dawson*, 572 S.E.2d 34, 37–38 (Ga. Ct. App. 2002)).

Despite this, Catherine supports her "knowing untruths" argument by pointing to *Bateast v. Dekalb County* where the Georgia Court of Appeals held that a jury could "make a reasonable inference that [police officers] proceeded in their arrest of [an individual] despite their knowledge that she had not committed the crimes for which they accused her." 572 S.E.2d 756, 758 (Ga. Ct. App. 2002). Well, as discussed above, the Officer Defendants weren't required to know, for certain, whether Catherine was actually drunk as outlined by the local ordinance. Relying on *Bateast* and the several

---

[94] [Doc. 26, p. 19].

factual issues in this case that belong in front of a jury, Catherine contends that a reasonable jury "could find malice" such that the Court should not grant official immunity to the Officer Defendants on her claim for false imprisonment.[95] *See Hardigree v. Lofton*, 992 F.3d 1216, 1233 (11th Cir. 2021) (quoting *Bateast*, 572 S.E.2d at 758); *cf. Gentry v. Steele*, No. 4:23-cv-00157-WMR, 2025 WL 4059731, at *3 (N.D. Ga. Feb. 12, 2025) ("It would be improper, then, for this [c]ourt to grant official immunity and wrest such a determination properly allocated to the trier of fact, who could make a reasonable inference that [the defendant] had 'knowledge that [the plaintiff] had not committed the crimes for which they accused her, thereby deliberately intending to do a wrongful act[.]'") (quoting *Bateast*, 572 S.E.2d at 758).

At the end of the day, though, it must not be forgotten that the actual malice requirement under Georgia law speaks to "perhaps a wicked or evil motive." *Adams*, 520 S.E.2d at 898 (quoting *Kidd*, 518 S.E.2d at 125). That just isn't supported by the evidence in this case. Also "[m]issing from the record . . . is any evidence showing that [Officer Tucker] intentionally [wrote] false [statements] in a deliberate effort to act wrongfully or to harm [Catherine] . . . ." *Davis*, 706 F. App'x at 560. And this much is clear under Georgia law, *that* is required for a finding of actual malice. *Id.* Is there speculation about why Officer Tucker wrote what he did in his field report? Certainly. Speculation, though, won't place the issue of official immunity in front of a jury. *Conley*,

---

[95] [Doc. 26, pp. 18–19].

572 S.E.2d at 37–38; *see also Liberty Lobby, Inc.*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted). In truth, the Officer Defendants may have very well been mistaken in their probable-cause assessment, and misguided as they may have been, that's not enough to show actual malice and overcome official immunity. *Croland*, 782 F. App'x at 760 (holding, "That an officer's decision to arrest may be 'misguided,' 'mistaken,' 'flawed,' or unsupported by probable cause is not enough to overcome official immunity."); *see also Mercado v. Swoope*, 798 S.E.2d 291, 294 (Ga. Ct. App. 2017) ("Even when an arresting officer operates on a mistaken belief that an arrest is appropriate, official immunity still applies."). "Nor is 'evidence demonstrating frustration, irritation, and possibly even anger . . . sufficient to penetrate official immunity." *Croland*, 782 F. App'x at 760 (quoting *Selvy v. Morrison*, 665 S.E.2d 401, 406 (Ga. Ct. App. 2008)).

"An officer is unentitled to summary judgment on official immunity grounds" where sufficient evidence exists that the officer—at the time of an arrest—had "actual subjective knowledge that no crime was committed and, thus, acted with a deliberate intent to break the law." *Id.* (citing *Lagroon v. Lawson*, 759 S.E.2d 878, 883 (Ga. Ct. App. 2014)) (emphasis omitted). In *Bateast*, the Georgia Court of Appeals reversed a trial court's grant of summary judgment on official immunity grounds because there was evidence that the officers arrested the plaintiff *after* they had successfully verified that

58

she had not committed a crime. 572 S.E.2d at 758. Those aren't the facts of this case.

"Against the backdrop of cases applying Georgia's official immunity doctrine, [the Court] cannot conclude (by inference) from the evidence in this record that [the Officer Defendants'] conduct rose to the level of actual malice or an actual intent to injure [Catherine]." *Croland*, 782 F. App'x at 761. "Evidence sufficient to overcome immunity in Georgia must do more than maybe give rise to a suspicion of improper motive." *Id.* Unlike the officers who were denied official immunity in *Bateast*, "nothing evidences adequately that [the Officer Defendants] had actual subjective knowledge at the time of [Catherine's] arrest that [she] had plainly committed no offense or knowledge that probable cause was doubtlessly lacking." *Id.* at 761–62. As explained above, the Court has determined that the current record (viewed in Catherine's favor) shows that genuine disputes of material facts exist as to whether there was no probable cause to arrest her.

Nevertheless, Georgia law makes clear that for Catherine to avoid summary judgment on official immunity grounds—to merely show that the Officer Defendants lacked probable cause to arrest or that their decision to arrest her was "mistaken" or even "reckless" is not enough. *Id.* at 761 (citing cases). The Officer Defendants are clearly entitled to official immunity with respect to Catherine's claim for false imprisonment. Accordingly, the Court **GRANTS** their motion for summary judgment on that claim.

**CONCLUSION**

Whether Catherine was right all along when she told Officer Cinereski that his and Officer Tucker's arrest "violat[ed] [her] rights" under the Constitution will, however, be up to a jury. "The Constitution does not allow" advice, unsolicited as it may have been, "to be made a crime." *Hill*, 482 U.S. at 462. So, for the reasons set out more fully above, the Court **DENIES** summary judgment to the Officer Defendants with respect to Catherine's claims under § 1983, but it **GRANTS** them summary judgment on her claim for false imprisonment under Georgia law.[96]

Since, in "[r]eading the facts in the light most favorable" to Catherine as the nonmovant, *Toole*, 798 F. App'x at 383, there is enough to dodge the qualified immunity defense asserted by the Officer Defendants on her § 1983 claims, there's enough to leave part of the issues of attorney's fees and punitive damages for a later day.

As for Catherine's claim for attorney's fees, 42 U.S.C. § 1988 allows for the award of "a reasonable attorney's fee" for "various kinds of civil rights cases." *Fox v. Vice*, 563 U.S. 826, 833 (2011). As such, the Court **DENIES in part** the Officer Defendants' efforts to obtain summary judgment on Catherine's claim for attorney's fees.[97] However, with respect to her claim for reasonable attorney's fees under O.C.G.A. § 13-6-11 and her claim for punitive damages as it relates to her claim for false imprisonment under

---

[96] [Doc. 25].

[97] [Doc. 1, ¶¶ 65–67].

60

Georgia law, *see* n.37, *supra*, the Court **GRANTS** summary judgment to the Officer Defendants given that they are entitled to official immunity on her sole state law claim.[98]

Regarding damages, should Catherine prevail on her claims brought under § 1983, that statute "allows for the recovery of nominal damages where [her] constitutional rights were violated but the violation did not result in any injury giving rise to compensatory damages." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009); *see also Al–Amin v. Smith*, 511 F.3d 1317, 1335 (11th Cir. 2008) ("Our precedent . . . recognizes the award of nominal damages for violations of the fundamental constitutional right to free speech absent any actual injury."). Prevailing § 1983 plaintiffs may also be entitled to punitive damages "even without a showing of actual loss by the plaintiff if the plaintiff's constitutional rights have been violated." *Harden v. Pataki*, 320 F.3d 1289, 1300 n.14 (11th Cir. 2003) (quoting *Dykes v. Hosemann*, 743 F.2d 1488, 1500 (11th Cir. 1984)). However, those damages are only available in a § 1983 case "when [a] defendant's conduct is shown to be motivated by evil motive or intent or when it involves reckless or callous indifference to the federally protected rights of others." *Hooks v. Brewer*, 818 F. App'x 923, 931 (11th Cir. 2020). Considering this, the Court **DENIES** the Officer Defendants' efforts to obtain summary judgment on Catherine's

---

[98] [*Id.* at ¶¶ 66]; *see also* n.39, *supra*.

claim for punitive damages as it relates to her federal claims.[99]

"Because several fundamental questions . . . are disputed and remain unresolved, deciphering 'this highly disputed factual record' is 'exactly the sort of factual, credibility-sensitive task best left to the jury.'" *Toole*, 798 F. App'x at 386 (quoting *Skop*, 485 F.3d at 1141). Upon being presented with the evidence, a jury can determine whether Catherine was intoxicated under the ordinance; whether Officer Cinereski gave her a request or a lawful command; whether there was any amount of probable cause to arrest her for any crime; whether she was exercising a First Amendment right or just butting her nose where it didn't need to be; or whether the Officer Defendants used their authority to teach her a lesson for exercising what many Americans consider to be the most important of our rights under the Constitution; and if Catherine is entitled to damages, whether she should receive the $1 nominal damages or more.

The Court will soon issue an order instructing the parties to develop a pretrial order for its consideration. The Court schedules a pretrial conference for this matter to be held at 2:00 P.M. on October 1, 2026, in Athens, Georgia. Trial shall commence on *October 26, 2026*, in Athens, Georgia.

**SO ORDERED**, this 10th day of July, 2026.

S/ *Tilman E. Self, III*
**TILMAN E. SELF, III**
**UNITED STATES DISTRICT JUDGE**

---

[99] [Doc. 1, ¶ 64].